UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

PLAINTIFF,

CASE NO. _____

v.

$42,484 IN U.S. CURRENCY, and

57 ASSORTED ELECTRONIC DEVICES,

DEFENDANTS.

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

The plaintiff, United States of America, through its attorneys Erica H. MacDonald, United States Attorney for the District of Minnesota, and Sarah E. Hudleston, Assistant United States Attorney, in a civil cause of action for forfeiture, alleges as follows in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure:

## NATURE OF THE ACTION

1.     This is an action to forfeit and condemn to the use and benefit of the United States of America $42,484 in U.S. Currency and 57 assorted electronic devices for violations of 18 U.S.C. § 1341, 18 U.S.C. § 1343, and 18 U.S.C. § 371.

## THE DEFENDANT *IN REM*

2.     The defendants *in rem* are $42,484 in U.S. Currency and 57 assorted electronic devices (see Exhibit A) (collectively, "the Defendant Property") seized from Phen Thach Khmer Krom after the execution of a search warrant on October 18, 2018,

at Angkor Trader, LLC. The Defendant Property is in the custody of the United States Secret Service.

## JURISDICTION AND VENUE

3.    Plaintiff brings this action *in rem* in its own right to forfeit and condemn the Defendant Property.  This Court has jurisdiction over an action commenced by the United States under 28 U.S.C. § 1345 and over an action for forfeiture under 28 U.S.C. § 1355(a).

4.    This Court has *in rem* jurisdiction over the Defendant Property under 28 U.S.C. § 1355(b).  Upon the filing of this Complaint, the Plaintiff requests that the Clerk of Court issue an arrest warrant *in rem* pursuant to Supplemental Rule G(3)(b)(i), which the Plaintiff will execute upon the Defendant Property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

5.    Venue is proper in the District of Minnesota pursuant to 28 U.S.C. § 1355(b)(1) because acts or omissions giving rise to the forfeiture occurred in this District, and pursuant to 28 U.S.C. § 1395 because the Defendant Property is located in this District.

## FACTS

6.    Angkor Trader LLC ("Angkor") is a secondhand electronics dealer at 422 University Ave West, Suite #4, St. Paul, MN 55103.

7.    Phen Thach Khmer Krom (Krom) is the owner of Angkor.

8.    Krom registered Angkor with the Minnesota Secretary of State on May 23, 2017.

## Angkor's History with Stolen Cell Phones

9.      In 2017 and 2018, the St. Paul Police Department (SPPD) Financial Crimes Intelligence Unit received numerous reports from law enforcement departments in the Twin Cities area that Angkor was buying and selling stolen electronics, including iPhones, computers, iPads, iWatches, and other items.

10.     In its investigations of thefts, robberies and burglaries, SPPD has recovered multiple stolen cell phones from Krom that Angkor had purchased.

11.     On November 22, 2017, Metro Transit Police responded to a report of a stolen cell phone.  A Metro Transit Police officer went to Angkor because it was known as a buyer of stolen cell phones and recovered two stolen phones.

12.     On December 17, 2017, SPPD worked with a confidential reliable informant (CRI) to do a controlled sale at Angkor. SPPD gave the CRI two new in-the-box cell phones to sell to Krom. The CRI entered Angkor gave Krom the boxes containing the phones.  Krom inspected the phones and paid the CRI $400 for one of them and $110 for the other. The CRI turned over the $510 to SPPD.

13.     On September 13, 2018, Hopkins Police received a report of a stolen iPhone.  They tracked the phone back to Angkor, which had purchased the stolen phone.

14.     In October 2018, the Blaine Police Department identified D.S. as a suspect in several electronics thefts.  Surveillance video captured D.S. and D.S.'s car at thefts of local retailers.  D.S. and others would run into stores like Best Buy and Target, cut or pull off display cords on phones and computers, and run out of the store.

15.     Investigators learned that when D.S. stole phones he would drive to Angkor to sell the phones.

16.     D.S. would put the phones in an envelope and Krom would give D.S. money in a different envelope.

17.     In November 2018, Blaine Police Department obtained a search warrant for D.S.'s cell phone.  Investigators found a text/photo message exchange with phone number 612-598-1043 regarding serial numbers of computers.  612-598-1043 is the phone number Krom listed as his own on the Secret Service Seized Asset Claim Form.

18.     Krom's contact name in D.S.'s phone is "Moneyyy."

19.     In the message exchange on October 15, 2018, D.S. sent "Moneyyy" (Krom) photographs of the serial numbers imprinted on three Apple laptop computers. Moneyyy responded, "Got it."

20.     D.S. then sent Moneyyy a fourth photo of an Apple laptop serial number. Moneyyy responded "5 total" and D.S. replied "4" … "U got them."

21.     Moneyyy sent back a photo to D.S. writing "I can['t] read the serial number for this one." … "Can you text me again please."  D.S. complied and sent a new photo.

22.     The conversation concluded as follows (the green icon is "Moneyyy" and the blue icon is D.S.):



23.     The message exchange, when converted to Central Time, runs from 7:38pm to 8:54pm on October 15, 2018, two days before law enforcement searched Angkor.

## LeadsOnline

24.     Secondhand Dealers like Angkor are required by the City of St. Paul to record all purchases of computers and cell phones, among other things, for which they paid $25 or more.

25.     Angkor and other dealers must document the following information, among other:

    a.  date and time of purchase;

    b.  accurate description of any person from whom the property was purchased, including full name; date of birth; residence; physical description, and the identification number of specified forms of identification;

    c.  a complete and accurate description of each item including, but not limited to any trademarks, identification numbers, serial numbers, model numbers, brand name or other identifying mark on such item; and

    d.  the amount of purchase money.

26.    On July 30, 2018, the City of St. Paul Department of Safety and Inspections sent a letter to all secondhand dealers, including Angkor, reminding them of the specifics of their reporting obligations. The letter noted that compliance with the reporting requirements "assist[s] in the recovery of stolen items and the solving of crimes … ."

27.    Recording can be done electronically, through a platform called LeadsOnline, or manually with individual forms.

28.    When it did record its purchases, Angkor did so through LeadsOnline.

29.    However, as discussed below, Angkor failed to record numerous items that it purchased from sellers and that should have been recorded.

30.    As one example, D.S., the theft suspect with whom Krom exchanged text messages shown above, was never listed in LeadsOnline as the seller of any item Angkor purchased despite multiple known sales to Angkor.

31.     Additionally, on at least one occasion, Krom entered a new phone into LeadsOnline as "heavily used."

## The Search

32.     On October 17, 2018, Minnesota Financial Crimes Task Force (MNFCTF) members of the St. Paul Police Department (SPPD) and the Blaine Police Department executed a search warrant at Angkor.

33.     Just prior to the search, the Blaine Police Department, through a cooperating confidential defendant (CCD), conducted a controlled sale at Angkor of two merchant-provided iPhones: an iPhone 8+ and an iPhone X 64GB.  CCD was an accomplice of D.S. in some of the above-referenced thefts.

34.     On October 17, 2018, CCD told D.S. that he had two stolen phones to sell and D.S. agreed to take CCD to Angkor.  Police surveillance watched as the two entered Angkor and after a few minutes the search team went in and arrested CCD and D.S.

35.     Krom produced the two iPhones to one of the officers present and said he paid D.S. and CCD $500 for the phones.

36.     In the minutes between his purchase of these phones and the search team entry, Krom had already removed the security-cord adhesive from the two phones, which had been merchant display models.

37.     Krom also had already plugged the phones into his computer to erase their contents.

38.     In addition to these two phones, the search of Angkor yielded 46 new-in-

box cellular phones, 7 new-in-box iPads, 4 new-in-box iWatches and $42,484.00 in genuine U.S. currency. *See* Exhibit A.

39.     Thus, all 57 of the devices seized for forfeiture and listed in Exhibit A were new, in-the-box, products.

40.     Krom had not entered any of the 57 seized items into the LeadsOnline database, as required by city ordinance.

41.     Research of the serial numbers showed that 49 of the 57 seized devices had been shipped to chain retailers' distribution centers around the country, including T-Mobile, Target, Sprint, Best Buy, and others.

42.     However, none of these items ever made it to the point of sale, meaning they were stolen from the retailers' distribution centers or from the shelves of the stores.

43.     Krom/Angkor had subsequently purchased these items in brand new condition, still in the box.

44.     The retail prices for iPhone X Max are $1,099 for 64 GB, $1,249 for 256 GB, and $1,449 for 512 GB.

45.     Krom said for a "good phone" he pays a seller $200, $300 or sometimes $500.

46.     Other evidence seized at Angkor included Krom's personal computer, iPad and iPhone, which were seized as evidence by SPPD for forensic analysis.

47.     Analysis of Krom's computer showed that he had connected 543 cell phones/tablets to that computer between August 17, 2018 and October 17, 2018, to erase the contents of the phones for resale.

48.   Of these 543 devices, only 73 had been entered into LeadsOnline. The earliest entry was on August 16, 2018, and the latest were on October 11, 2018.

49.   Of the 73 devices recorded in LeadsOnline, 11 were still registered to a secondhand dealer other than Angkor.

50.   For example, five of the devices were registered in LeadsOnline as having been purchased by the secondhand dealer "Game Stop," instead of by Angkor.

51.   Other devices were registered as having been purchased by secondhand stores in Alabama, Ohio, and Illinois, again without an update showing the purchase by Angkor that would have brought the devices into Krom's possession.

### Angkor's Bank Accounts

#### Wells Fargo Account

52.   On May 23, 2017, Krom opened a Wells Fargo Business Checking account in the name of Angkor Trader LLC.

53.   For the month of June 2017, Angkor's Wells Fargo Business Checking account had $4,400 in total deposits and $3,740.81 in total withdrawals/debits.

54.   For the month of July 2017, Angkor's Wells Fargo Business Checking account had $13,090 in total deposits and $13,299.44 in total withdrawals/debits.

55.   For the month of August 2017, Angkor's Wells Fargo Business Checking account had $8,180 in total deposits and $7,689.46 in total withdrawals/debits.

56.   For the month of September 2017, Angkor's Wells Fargo Business Checking account had $11,881.37 in total deposits and $12,115.05 in total withdrawals/debits.

57.    For the month of October 2017, Angkor's Wells Fargo Business Checking account had $22,628 in total deposits and $22,877.29 in total withdrawals/debits.

58.    In November 2017, Angkor began receiving ACH deposits to its Wells Fargo account from "Kt Corp." in California.

59.    KT Corp., located in Walnut, California, is an electronics wholesale business that specializes in buying and selling smartphones, both "New in box" and used, and other electronics.

60.    In November 2017, Angkor's Wells Fargo Business Checking account received wires from KT Corp. of $7,920, $6,030, $3,500, $6,185, and $7,530, for a total of $31,165, and had total deposits of $49,211.46 and total withdrawals/debits of $32,468.07.

61.    In December 2017, Angkor's Wells Fargo Business Checking account received wires from KT Corp. of $8,950, $4,135, $8,810, $4,520, $3,930, $1,380, $5,240, $8,705, $7,660, $6,105, $7,105, $10,410, $12,330, $9,000, $9,390 and $9,500 for a total of $117,170, and had $127,415 in total deposits and $144,236.81 in total withdrawals/debits.

62.    In January 2018, Angkor's Wells Fargo Business Checking account received wires from KT Corp. of $24,640, $9,000, $8,005, $8270, $7,335, $7,705, $6,855, $8,310, $8,110, $5,150, $8,985, $9,005, $9,575, and $9,360 for a total of $105,665, and had $130,410.89 in total deposits and $120,992.34 in total withdrawals/debits.

63.   In February, 2018, Angkor's Wells Fargo Business Checking account received wires from KT Corp. of $7,670, $9,880, $6,665, $9,645, $9,905, $3,848, $9,205, $9,540, $8,755, $9,555, $9,975, $9,190, $8,390, $8,685, $7,330, $9,595, $9,290, $10,755, $9,490, $10,125, $9,455, $9,420, and $10,545 for a total of $206,913, and had $207,723 in total deposits and $201,902.19 in total withdrawals/debits.

64.   In March 2018, Angkor's Wells Fargo Business Checking account received wires from KT Corp. of $6,490, $9,525, $14,060, $15,005, $9,810, $7,905, $5,995, $8,840, $8,880, $9,975 and $9,920 for a total of $106,405, and had $107,255 in total deposits and $107,643.66 in total withdrawals/debits.

65.   In April 2018, Angkor's Wells Fargo Business Checking account received wires from KT Corp. of $9,995, $8,320, $9,710, $3,845, $8,540, $6,570, $6,655, $9,130, and $9,880 for a total of $72,645, and had $82,996 in total deposits and $94,553.46 in total withdrawals/debits.

66.   In May 2018, Angkor's Wells Fargo Business Checking account received wires from KT Corp. of $3,325, $9,020, $9,965, $12,050, and $11,475 for a total of $45,835, and had $100,629 in total deposits and $94,410.88 in total withdrawals/debits.

67.   In June 2018, Angkor's Wells Fargo Business Checking account received wires from KT Corp. of $3,325, $9,020, $9,965, $12,050, and $11,475 for a total of $45,835, and had $86,625 in total deposits and $74,599.45 in total withdrawals/debits.

68.   In July 2018, Angkor's Wells Fargo Business Checking account received wires from KT Corp. of $15,635 and $9,880 for a total of $25,515, and had $98,362 in

total deposits and $86,468.32 in total withdrawals/debits.

69.    Angkor's Wells Fargo Business Checking account also received wire transfers from AK Tronics.

70.    AK Tronics is another secondhand electronics dealer in St. Paul, Minnesota, with a website slogan "Cash for Phones, AK Buys Phones."

71.    From March 1, 2018, to October 22, 2018, Angkor's Wells Fargo Business Checking account received 28 deposits from AK Tronics for a total of $418,144.

72.    From January to October 22, 2018, Angkor's Wells Fargo account received **$1,191,802** in deposits from KT Corp. and AK Tronics combined.  During this period Krom made **$1,005,803** in cash withdrawals from this account.

### US Bank Accounts

73.    On December 22, 2017, Krom opened an account at US bank under the name Angkor Trader LLC, listing himself as the owner.

74.    From January 12, 2018, to March 19, 2018, Angkor's US Bank account received 17 ACH deposits from KT Corp, totaling $139,503.  This was all but $700 of the credits to this account during this roughly three-month period.

75.    Between December 20, 2017, and January 2, 2018, Krom's personal US Bank account received $69,450 in nine deposits from KT Corp.  In this 14-day period, Krom made $64,000 in cash withdrawals.

**Angkor's Shipping Records**

76.    Between May 2017 and November 15, 2017, Angkor shipped three packages.

77.    Between November 15, 2017, and April 4, 2018, it shipped 101 packages, 91 of which were sent to KT Corp. in California.

78.    Krom told investigators that he ships about 10-15 phones per box to KT Corp. and that he earns $30-40 profit per phone.

79.    During the relevant period, Krom's only known source of employment and income has been his company, Angkor Trader LLC, 422 University Ave. West, Unit #4, St. Paul 55103.

## BASIS FOR FORFEITURE

80.    The allegations in the preceding paragraphs are re-alleged and incorporated by reference.

81.    The defendants $42,484 in U.S. Currency and 57 assorted electronic devices are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) because they constitute or are derived from proceeds of Mail Fraud, Wire Fraud, and Conspiracy.

## CLAIM FOR RELIEF

82.    The plaintiff requests that the Court issue a warrant for the arrest and seizure of the Defendant *in rem*, that notice of this action be given to all persons who reasonably appear to be potential claimants of interests in the Defendants *in rem*, that the Defendants *in rem* be forfeited and condemned to the United States of America,

that the plaintiff be awarded its costs and disbursements in this action, and for such

other and further relief as this Court deems proper and just.

Dated: March 11, 2019                    ERICA H. MacDONALD
                                         United States Attorney

                                         *s/ Sarah E. Hudleston*

                                         BY:  SARAH E. HUDLESTON
                                         Assistant U.S. Attorney
                                         Attorney ID No. 0351489
                                         600 United States Courthouse
                                         300 South Fourth Street
                                         Minneapolis, MN 55415
                                         Phone:  612-664-5600
                                         sarah.hudleston@usdoj.gov

## VERIFICATION

I, Robert Adams, verify and declare under penalty of perjury as follows:

I am a Special Agent with the United States Secret Service ("USSS"). I have held this position for over 18 years. As a Special Agent, my duties include investigating violations of Title 18, including but not limited to bank fraud, access device fraud, wire fraud, identity theft, counterfeiting, and money laundering. I have read the foregoing Verified Complaint *In Rem* and know the contents thereof, and the matters contained in the Verified Complaint are true to my own knowledge, except that those matters not within my knowledge are alleged on information and belief, and I believe those matters to be true.

The sources of my knowledge and information and the grounds of my belief include the official files and records of the United States, information provided to me by other law enforcement agencies and officers, and information I have learned by reviewing reports prepared by other law enforcement agencies and officers, as well as my investigation of this case, together with others.

I hereby verify and declare under penalty of perjury that the foregoing is true and correct.

Dated: March 11, 2019                    *s/Robert Adams*
                                          Robert Adams
                                          Special Agent, USSS